Filed 10/17/22  In re A.A. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | B317503 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALBERT A.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP02723B) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Juvenile Court Referee. Conditionally affirmed and remanded with directions.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father appeals from an order terminating his parental rights. On appeal, he contends the juvenile court erred in finding the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) did not apply. Father argues the Los Angeles County Department of Children and Family Services (DCFS) failed to conduct an adequate initial inquiry to determine whether A.A. is or may be an Indian child. Although both parents submitted forms to the juvenile court denying knowledge of any Indian ancestry, DCFS never asked father any ICWA-related questions and the record casts doubt on the reliability of the parents' statements. We conclude the juvenile court prejudicially erred in finding that DCFS conducted proper and adequate inquiry, and that it exercised due diligence, in determining whether A.A. is or may be an Indian child. We conditionally affirm the juvenile court's order and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

Father raises a limited issue on appeal. We therefore only briefly summarize the general background of this case. In November 2019, the juvenile court sustained a petition alleging then one-year-old A.A. was a person described by Welfare and Institutions Code section 300, subdivision (b),[1] as a result of mother's substance abuse, and father's past substance abuse and

_____

[1] All undesignated statutory references are to the Welfare and Institutions Code.

2

criminal history.[2] The juvenile court removed A.A. from the parents' custody, ordered him suitably placed, and ordered DCFS to provide both parents with family reunification services. The juvenile court terminated the parents' reunification services in November 2020. In December 2021, the court terminated parental rights.

### DCFS initial investigation and ICWA inquiry

On September 24, 2018, DCFS received a referral alleging mother was "get[ting] high daily on [m]eth in front of her two children." The agency interviewed mother on September 26, 2018. Mother admitted she had regularly used methamphetamines in the past, but she denied any current substance abuse and did not appear to be under the influence. The next day, however, mother failed to show up for a drug test DCFS had arranged. DCFS took no further action until November 19, 2018, when it received another referral reporting that mother was using drugs and leaving A.A. and his half sibling unattended. The source—a person who was renting mother a room—said mother avoided being home during the day out of fear that social workers would catch her using drugs. In January 2019, DCFS began attempting to contact mother by letter, telephone, and with an in-person visit to her home. Social workers' attempts at contact were unsuccessful. In mid-February 2019, DCFS finally located and spoke with mother, who was in the hospital after suffering a miscarriage. Mother admitted she had used methamphetamines five days earlier.

---

[2] A.A.'s half sibling was also a subject of the petition. This appeal concerns A.A. only.

Over the next several weeks, mother repeatedly failed to submit to drug tests and missed appointments with a substance abuse navigator. DCFS lost contact with her until April 2019, when the agency received another referral. The reporting party suspected mother was using drugs. The children had been staying with the reporting party, but mother took the children and their whereabouts were unknown. DCFS obtained a removal order and sought to detain the children at large. However, on May 1, 2019, the date set for the detention hearing, DCFS located the children at the home of the maternal aunt.

An Indian Child Inquiry Attachment form was attached to the April 30, 2019 petition. Boxes were checked indicating "Indian child inquiry" was "not made," and further that A.A. "may have Indian ancestry." Yet, the form also reported mother was questioned on September 26, 2018, at which time she denied any "Native American heritage." The detention report dated May 1, 2019, repeated mother's September 26, 2018 denial of Native American ancestry. DCFS had not asked father about Native American ancestry because his whereabouts were unknown.

At the May 1, 2019 detention hearing, mother submitted a Parental Notification of Indian Status form (ICWA-020), declaring she has no Indian ancestry as far as she knows. During the proceedings, the court asked if there was any "American Indian heritage on behalf of . . . the mom[?]" Mother's counsel answered: "Not on behalf of mother." The court found it did not have a reason to know that ICWA applied with respect to mother.

Father appeared in custody for arraignment on May 6, 2019. He submitted an ICWA-020 form stating he has no Indian ancestry as far as he knows. On the record, the court

4

received the form, reported father's statement, and found ICWA was not applicable as to father. The minute order reflected the finding that the court did not have a reason to know that A.A. is an Indian child, and it did not order notice to any tribe or the Bureau of Indian Affairs. The parents were ordered to keep DCFS, their attorneys, and the court aware of any new information relating to possible ICWA status.

The June 2019 jurisdiction and disposition report referenced the juvenile court's May 6, 2019 finding that ICWA did not apply. DCFS was unable to interview either parent for the report. Father's whereabouts were again unknown. He had been released "to the custody of Riverside Sheriff Warrant," and DCFS was unable to locate him. On June 3, 2019, DCFS interviewed an individual who identified himself as father's former legal guardian. The former legal guardian reported that father and father's sibling used to live with him, but they had not resided with him for some time.

Mother had agreed to meet the dependency investigator for an interview, but she failed to show up at the scheduled time. Mother also did not submit to drug testing. A.A. and his half sibling were placed with the maternal aunt. Mother did not respond to the maternal aunt's calls to arrange for mother to visit the children. While expressing frustration with mother's lack of contact, the maternal aunt said she did not understand mother's behavior, explaining: "[W]e grew up without a mother and it was so hard."

Eventually, DCFS was able to locate and interview father in custody. On July 3, 2019, father told a social worker he was born and raised in Los Angeles County. He was raised by his maternal uncle after his mother was deported to Mexico. He

5

never met his biological father. Father further reported he has four brothers and two sisters. He stopped attending school in the 11th grade and did not graduate from high school. He began using marijuana when he was 14 years old. He started using methamphetamines at the age of 16. DCFS reported the interview was short because father appeared groggy and "often appeared to fall asleep during the interview." There is no indication that the social worker asked father any ICWA-related questions.

Between June and November 2019, DCFS was unable to make contact with mother. DCFS also lost contact with father but located him again in custody in November 2019. In a second interview, DCFS asked father to identify relatives for potential placement. Father suggested his girlfriend, who was pregnant with his child, and his sister-in-law. In late November 2019, a social worker contacted the sister-in-law, who reported she is married to father's brother (A.A.'s paternal uncle), but he was not living with her. The sister-in-law said the paternal uncle "is in the same situation as [father]." The sister-in-law was willing to care for A.A., but not A.A.'s half sibling, because she has four children of her own.[3] DCFS eventually placed A.A. with a maternal cousin, the maternal aunt's daughter. The maternal cousin and her fiancé became A.A.'s prospective adoptive parents.

---

[3] It is not clear if the sister-in-law's statement about the paternal uncle's situation was a reference to incarceration or some other circumstance. The record also does not specify whether the sister-in-law's four children are A.A.'s paternal cousins.

6

With respect to ICWA, all reports that followed the detention report reflected only the juvenile court's previous findings that it had no reason to know that ICWA applied as to either parent, or the court's prior finding that ICWA did not apply.

## DISCUSSION

On appeal, father raises only a single issue: he contends DCFS failed to conduct a proper inquiry as to whether A.A. is or may be an Indian child. DCFS asserts substantial evidence supports the juvenile court's finding that ICWA does not apply in this case, and any error in failing to interview extended family members was harmless. We conclude DCFS's inquiry was inadequate and remand is necessary for further proceedings.

### I.  Duty of inquiry

"ICWA was enacted ' "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." [Citation.]' (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 . . . ; see 25 U.S.C. § 1902.)" (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1078.)

To that end, under section 224.2, subdivision (a), both the juvenile court and the child welfare agency have an "affirmative and continuing duty" to inquire whether a child is or may be an Indian child, beginning with the "initial contact," which includes asking the party reporting abuse or neglect if they have any information that the child may be an Indian child. An " 'Indian child' " is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for

7

membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); § 224.1, subd. (a).)

Under section 224.2, subdivision (b), if a child is placed in the agency's temporary custody, the agency must inquire whether the child is or may be an Indian child, by asking a nonexclusive group of persons that includes the child, the parents, extended family members, and "others who have an interest in the child." Under section 224.2, subdivision (c), at the first court appearance of each party, the juvenile court must ask whether the appearing party knows or has reason to know that the child is an Indian child.  In addition, the court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.

Under section 224.2, subdivision (e), if the court or social worker has reason to believe an Indian child is involved in the proceeding, but does not have enough information to determine there is a reason to know the child is an Indian child, the court or the social worker must make further inquiry, as soon as practicable.  "[R]eason to believe" means the court or social worker has information "suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe."  (§ 224.2, subd. (e)(1).)

There is "reason to know" a child is an Indian child when: a person having an interest in the child informs the court the child is an Indian child; the residence of the child, the child's parents, or the child's Indian custodian, is on a reservation or in an Alaskan Native village; a participant in the proceeding, officer of the court, Indian tribe or organization, or agency informs the court it has discovered information indicating the child is an

Indian child; the child gives the court reason to know that the child is an Indian child; the court is informed that the child is or has been a ward of a tribal court; or the court is informed either the parent or the child possesses an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).)

Section 224.2, subdivision (i)(2), provides that if "the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."

## II. Standard of review and test for prejudicial error

Courts have generally reviewed " ' "the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

In *In re Ezequiel G.* (2022) 81 Cal.App.5th 984 (*Ezequiel G.*), a majority of a panel of this court further defined the standard of review for alleged ICWA inquiry errors, when asserted in an appeal from an order terminating parental rights. The *Ezequiel G.* court concluded the juvenile court's determination of whether there is reason to know a child is an Indian child is reviewed for substantial evidence. (*Id.* at p. 1004.) However, the court reasoned the juvenile court's finding under section 224.2, subdivision (i)(2) as to whether a " 'proper and

9

adequate further inquiry and due diligence as required in this section have been conducted,' " is reviewed for an abuse of discretion. (*Ibid.*)

The Courts of Appeal have also adopted several divergent standards for determining whether a child welfare agency's failure to comply with the duty of inquiry is prejudicial error requiring reversal. These standards range from an automatic reversal approach (*In re H.V.* (2022) 75 Cal.App.5th 433, 438; *In re Y.W.* (2021) 70 Cal.App.5th 542, 556), to presumptive affirmance (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1065), with variations in between, including the test set forth in *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578 (*Dezi C.*). The *Dezi C.* court concluded the proper application of our state's test for harmless error in the ICWA inquiry context is that "an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding." The *Ezequiel G.* court adopted this standard. (*Ezequiel G., supra,* 81 Cal.App.5th at p. 1016.)

We need not discuss the divergent standards in detail here. Excepting the presumptive affirmance approach, we conclude that application of any of the other various tests employed by our fellow appellate courts mandates a remand for further proceedings in this case.[4]

_____

[4] We decline to follow the presumptive affirmance approach adopted by some courts, which finds no basis for reversal unless a parent shows that, if asked, he or she would have claimed to have

10

## III. DCFS inquiry was inadequate and prejudicial

Here, both parents submitted ICWA-020 forms to the court denying any knowledge that they have Indian ancestry. DCFS asked mother whether she had Indian ancestry when it first contacted her and she denied Indian ancestry at that time. However, the Indian Child Inquiry Attachment form reflecting mother's response also reported "Indian child inquiry" was *not* made, and that A.A. *may* have Indian ancestry. We cannot discern from the record whether the seemingly contradictory responses on the form reflected that DCFS had no information from father, that it had received equivocal information from mother, or whether there were merely mistakes in completing the form. The record does not indicate DCFS ever asked father any ICWA-related questions.

DCFS was in contact with at least two maternal relatives—the maternal aunt and the maternal cousin—but did not ask either of them whether A.A. is or may be an Indian child. Father mentioned having six siblings, but he did not recommend any of

___

Indian ancestry. (See *In re A.C., supra*, 65 Cal.App.5th at pp. 1065, 1069.) As the court explained in *Dezi C.*, "by focusing on what a parent proffers on appeal," the presumptive affirmance approach "ignores that the juvenile court record may provide a reason to believe that the juvenile court's ICWA finding is incorrect and that further inquiry is warranted. Where, for instance, a parent is never asked about his or her American Indian heritage or the parent's answer is of less value because the parent is adopted, the presumptive affirmance rule would mandate affirmance in the absence of a proffer, even though, in our view, there is on those facts reason to believe the child may be an Indian child." (*Dezi C., supra,* 79 Cal.App.5th at p. 785.)

11

them as potential placements for A.A. and the record is silent on whether father had any means of contacting them.[5]

Thus, DCFS did not interview father about ICWA, and it is undisputed the agency did not ask any extended family members whether A.A. is or may be an Indian child. Still, both parents denied Indian ancestry in the ICWA-020 forms submitted to the court. In *Ezequiel G.*, the court reasoned that in reviewing the juvenile court's ICWA finding that DCFS complied with its statutory duties, the "key inquiry should be whether the ICWA inquiry conducted has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding 'is or may be an Indian child' . . . . In other words, the focus of the court's analysis should not be on the number of individuals interviewed, but on whether the agency's ICWA inquiry has yielded reliable information about a child's possible tribal affiliation." (*Ezequiel G., supra,* 81 Cal.App.5th at p. 1009.)

---

[5] DCFS was in contact with father's sister-in-law, although the agency appears to suggest on appeal that she is not an "extended family member." We note the sister-in-law told DCFS she is married to father's brother, A.A.'s uncle, and she would therefore typically be identified as A.A.'s aunt (i.e., the wife of his uncle). Under Section 224.1, subdivision (c) and 25 U.S.C. § 1903, subdivision (2): " '[E]xtended family member' shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent[.]" The parties do not provide any legal argument as to whether an aunt by marriage is an "aunt" within the meaning of the statute, and we need not decide this issue.

Under the reasoning of *Ezequiel G.*, the parents' denials of Indian ancestry may be sufficiently reliable, such that a reviewing court may conclude the trial court did not abuse its discretion in determining no inquiry of extended family members was necessary for it to make a proper finding that ICWA did not apply. Likewise, in the analysis of the *Dezi C.* court, the parents' reliable statements denying Indian ancestry may indicate there is no reason to believe the child may be an Indian child, and any error arising out of DCFS's failure to inquire of extended family members is harmless. Here, however, several facts undermine the reliability of the information DCFS obtained about A.A.'s possible tribal affiliation. The maternal aunt told DCFS that she and mother had grown up "without a mother." Mother was not cooperative with DCFS and did not provide the agency with information about her family background, including her family circumstances. The record does not reflect the maternal aunt or other relatives were present at any court proceedings where ICWA was discussed. DCFS interviewed mother regarding Indian ancestry in September 2018, during the agency's first contact with her, which occurred after DCFS received a report that mother was actively abusing methamphetamines. DCFS did not report that it asked mother ICWA-related questions at any other time.

As to father, DCFS never asked father any ICWA-related questions. In his first interview, father told DCFS he was raised by a maternal uncle after his mother was deported, and he never met his biological father. Father also admitted significant substance use beginning when he was a young teenager.

Under these circumstances, using either a substantial evidence or abuse of discretion standard of review, we conclude

the juvenile court erred in implicitly finding DCFS exercised the due diligence required by section 224.2 in its initial ICWA inquiry, sufficient for the court to determine ICWA did not apply. There are concrete reasons to doubt the reliability of the parents' denials of Indian ancestry, highlighting the need for DCFS to attempt to obtain additional information, namely by actually asking father about any Indian ancestry or tribal affiliation, and further, by asking at least some available extended family members whether A.A. is or may be an Indian child. The record reflects there were maternal family members available to DCFS for such inquiry, and potentially paternal family members as well.

We cannot find the error harmless. Even in *Dezi C.*, the court explained that the reviewing court has reason to believe further inquiry might lead to different results "if the record indicates that the agency never inquired into one of the two parents' heritage *at all* . . . or if the record indicates that one or both of the parents is adopted and hence their self-reporting of 'no heritage' may not be fully informed." (*Dezi C., supra,* 79 Cal.App.5th at p. 779 (italics in original); see also *In re A.C.* (2022) 75 Cal.App.5th 1009, 1015-1016 [mother was product of foster care and may not have known her cultural heritage]; *In re Y.W., supra*, 70 Cal.App.5th at p. 548 [mother was adopted and had no information about biological relatives]; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 740 [father never appeared, and mother had no reason to know father's ancestry].)

In this case, DCFS never asked father about any Indian ancestry or whether A.A. is or may be an Indian child. Further, both mother and father were raised under circumstances suggesting a lack of knowledge about one or more of their

14

biological parents; father began using drugs at a young age, further calling into question the reliability of his reporting about his family history; and the first report on DCFS's ICWA inquiry of mother contained contradictory statements that were never addressed or clarified. The record thus prevents us from concluding DCFS's failure to conduct a proper initial inquiry was harmless.[6] Remand is necessary for further inquiry and compliance with ICWA.

---

[6] We note that at least one court has held ICWA inquiry error was harmless where the child was placed with a maternal relative for adoption, which presumably was consistent with ICWA's goal of preventing the removal of Indian children from their Indian families. In that case, *In re J.W.* (2022) 81 Cal.App.5th 384, 390–391, the mother appealed, asserting DCFS failed to ask maternal relatives about Indian ancestry. In contrast, here father appeals based, in part, on DCFS's failure to ask him or his relatives about Indian ancestry, and A.A. is to be adopted by a maternal relative. Thus, even if we were to find DCFS's lack of inquiry of mother's family members was harmless because a maternal relative plans to adopt A.A., we could not apply the same analysis to the claim that tribal affiliation could arise from *father's* lineage.

15

## DISPOSITION

The juvenile court's order terminating parental rights is conditionally affirmed. The case is remanded to the juvenile court to order DCFS to immediately comply with the inquiry provisions of Welfare and Institutions Code section 224.2 as to father, and available maternal and paternal relatives. After ensuring DCFS has complied with the inquiry, and, if applicable, notice provisions of ICWA and related California law, the juvenile court shall determine whether ICWA applies. If the court determines ICWA does not apply, the order terminating parental rights shall remain in effect. If the court determines ICWA does apply, it shall vacate its order terminating parental rights and proceed consistent with ICWA and related state law.

NOT TO BE PUBLISHED IN THE OFFICAL REPORTS.


ADAMS, J.*


We concur:


EDMON, P.J.


LAVIN, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.